PUBLIC FUNDS FOR PUBLIC SCHOOLS OF NEW JERSEY et al., Plaintiffs,

v.

Carl L. MARBURGER, State Commissioner of Education of the State of New Jersey, et al., Defendants.

The BOARD OF EDUCATION OF the CITY OF ORANGE, Plaintiff,

v.

Carl L. MARBURGER, State Commissioner of Education of the State of New Jersey, et al., Defendants.

Civ. A. Nos. 1107–72 and 1688–72.

United States District Court,
D. New Jersey.

April 5, 1973.

Ellen B. Kulka, for plaintiffs.

Edward J. Leadem, Trenton, N. J., for defendants-intervenors.

Philip Guidone, Montclair, N. J., for plaintiff, the Bd. of Ed. of the City of Orange.

Morton I. Greenberg, Asst. Atty. Gen., Lewis M. Popper, Deputy Atty. Gen., of the State of New Jersey, for defendants.

Before JAMES HUNTER, III, Circuit Judge, and BARLOW and KITCHEN, District Judges.

## OPINION

BARLOW, District Judge.

Plaintiffs in Public Funds for Public Schools of New Jersey et al. v. Carl L. Marburger et al., are an amalgam of individual citizen taxpayers and organizations asserting that New Jersey's Nonpublic Elementary and Secondary Education Act, N.J.S.A. 18A:58–59 et seq., violates the First and Fourteenth Amendments to the Federal Constitution. Consolidated therewith is The Board of Education of the City of Orange v. Carl L. Marburger et al., which raises identical issues. The defendants in both cases are the State of New Jersey and its Governor, William T. Cahill, Carl L. Marburger, State Commissioner of Education of the State of New Jersey, and Joseph M. McCrane, Treasurer of the State of New Jersey. With the consent of all parties, a number of parents of nonpublic school children have been permitted to intervene as defendants. Fed.R.Civ.P. 24(b).

The challenged statute provides for two separate programs to be administered by the Office of Nonpublic Education of the New Jersey State Department of Education. The first program, contained in Section 5 of the Act (N.J.S.A. 18A:58–63), furnishes state aid, in amounts up to $10.00 for elementary school students and up to $20.00 for high school students, to the parents of nonpublic school students as reimbursement for the cost of "secular, nonideological textbooks, instructional materials and supplies". The second program, set forth in Section 6 of the Act (N.J.S.A. 18A:58–64), provides that the amount left from the total appropriation after the textbook reimbursement program is funded will be assigned to schools, in accord with their respective number of pupils, to acquire secular supplies, equipment and auxiliary services. Plaintiffs seek a declaratory judgment and injunctive relief. Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343(3), 2201, 2202.

Pursuant to 28 U.S.C. §§ 2281, 2284, this three-judge court has been convened to determine whether or not the operation or execution of the Act should be permanently enjoined because it offends the Federal Constitution. Plaintiffs, further, seek a temporary restraining order, or, in the alternative, a preliminary injunction, restraining the defendants, Marburger, McCrane, Governor Cahill, and the State of New Jersey, their agents, employees, and successors in office, from disbursing further funds under N.J.S.A. 18A:58–59 et seq., or from otherwise participating in the administration or execution of the Act. Defendants move to dismiss the complaint for its failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

## STANDING

■■ The defendants challenge the standing of the individual and organizational plaintiffs to institute these actions. It is clear that the individual plaintiffs have standing to raise an Establishment Clause claim. Flast v. Coh-

en, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968). Moreover, we believe the organizational plaintiffs also have standing because their members are resident taxpayers of New Jersey, who thus have an economic stake in the outcome of this litigation. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972). Furthermore, the inclusion of the organizational plaintiffs will in no way prejudice the defendants' case, since the individual plaintiffs have standing and all plaintiffs are represented by the same counsel. *See* Committee for Public Educ. and Relig. Lib. v. Rockefeller, 322 F.Supp. 678 (S.D.N.Y.1971); Americans United for Sep. of Church and State v. Oakey, 339 F.Supp. 545 (D.Vt.1972).

## ABSTENTION

Defendants urge that the Court should apply the abstention doctrines to both of these cases. The State maintains that when the State court's interpretation of the statute or evaluation of its validity under the State constitution may obviate any need to consider its validity under the federal Constitution, the federal court should hold its hand, lest it render a Constitutional decision unnecessarily; Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). We do not accept this argument.

■ First, it would seem that such a complex and multifaceted statute might well produce a piecemeal adjudication of the Act in the State courts and thereby delay the ultimate adjudication as to its Constitutional merits. Such a delay would be unacceptable in a case predicated on a First Amendment claim. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Secondly, ". . . abstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal court should not abstain but proceed to decide the federal constitutional claim . . . We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court

should stay its hand and not decide the question before the state court decided it". Wisconsin . v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L. Ed.2d 515 (1971). Thirdly, we have not, nor have defendants, discovered any case law which is a precedent for the application of an abstention doctrine in Establishment Clause cases. Finally, we are persuaded that no New Jersey court could interpret the exclusive "textbook reimbursement" plan or the "auxiliary services" provision so as to avoid the Constitutional question. Thus, abstention would, in our view, be inappropriate. Wisconsin v. Constantineau, supra; Zwickler v. Koota, supra; Lewis v. Kugler, 446 F.2d 1343 (3rd Cir. 1971); Cine-Com Theatres Eastern States, Inc. v. Lordi, 351 F.Supp. 42 (D.N.J., 1972).

## PRELIMINARY INJUNCTION

■■ An application for a preliminary injunction is, of course, addressed to the discretion of the Court. Prendergast v. New York Tel. Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923); United States Steel Corp. v. Fraternal Ass'n of Steelhaul, 431 F.2d 1046 (3rd Cir. 1970); Allis-Chalmers Mfg. Co. v. White Consolidated Indus., 414 F.2d 506 (3rd Cir. 1969); Bieski v. Eastern Automobile Forwarding Company, 354 F.2d 414 (3rd Cir. 1965); United States v. Ingersoll-Rand Company, 320 F.2d 509 (3rd Cir. 1963). The exercise of the Court's discretion is, however, limited and controlled by the requirement that certain standards be observed. Generally, in order to be entitled to preliminary injunctive relief, an applicant is required to demonstrate irreparable harm and a reasonable probability of eventual success in the litigation. Scooper Dooper, Inc. v. Kraftco Corp., 460 F.2d 1204 (3rd Cir. 1972); A.L.K. Corporation v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3rd Cir. 1971). This test, however, has been expanded in cases involving the public interest to require a balancing of the following considerations: (1) Did the plaintiff make a strong showing that it is likely to prevail on the merits? (2) Did the plain-

tiff show that without such relief it would be irreparably injured? (3) Would the grant of a preliminary injunction substantially have harmed other parties interested in the proceedings? (4) Where lies the public interest? Commonwealth of Pennsylvania ex rel. Creamer et al. v. United States Department of Agriculture, 469 F.2d 1387 and McHale, Secretary of Agriculture v. United States Dept. of Agriculture, 469 F.2d 1387 (3rd Cir. 1972). See In re Penn Central Transportation Company, 457 F.2d 381, 384–385 (3rd Cir. 1972); Croskey Street Concerned Citizens v. Romney, 459 F.2d 109, 112 (3rd Cir. 1972), concurring opinion, Aldisert J. See, also, Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3rd Cir. 1971). The impact of the preliminary injunction sought here on the educational system of the State of New Jersey requires us, we think, to balance the needs of the parties with those of the public. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Moreover, in a taxpayer's suit, with which we are confronted here, an examination and evaluation of public interest will necessarily include the balancing of the equities among the respective parties. Accordingly, we adopt the four-point standard as the appropriate guide for our determination as to whether or not a preliminary injunction should issue in these cases.

■ The principal challenge to the Act rests upon the Establishment Clause of the First Amendment to the Federal Constitution. The First Amendment prohibits the Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof". The Fourteenth Amendment applies these prohibitions to state action. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

"The theory behind the First Amendment's Establishment Clause proscription is simply stated. In order that any funds, goods, or services granted by the state do not have the impermissible effect of advancing religion, the state must see that the effects of any such grant will not permit of their being put to religious uses." Americans United for Sep. of Church and State v. Oakey, supra, 339 F.Supp. at 549, citing Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and The Supreme Court, 1970 Term, 85 Harv.L. Rev., at 172 (1971). Plaintiffs assert that funds allocated pursuant to this Act violate the Establishment Clause because of the predominately religious character of the nonpublic schools whose fiscal stability the challenged statute is designed to promote.

Information provided by the Office of Nonpublic School Secular Education discloses that the number of nonpublic schools recorded in that office as of November 28th, 1972, totalled 752. The breakdown was as follows:

| | | | |
|---|---|---|---:|
| Religious | affiliated | Catholic | 591 |
| " | " | Lutheran | 8 |
| " | " | Jewish | 23 |
| " | " | Baptist | 2 |
| " | " | Other | 15 |
| Nondenominational | | | 100 |
| Other | | | 13 |
| | | Total | 752 |

During the State's fiscal year 1972, 719 of these schools participated in the program established by Section 5 of the Act and 734 of them participated in those programs created by Section 6 of the Act. 639 of the total of 752 nonpublic schools—or approximately 85% thereof—are characterized in the report as being religious-affiliated schools.

While in some instances it may be that religious values do not affect the content of the secular education provided by these institutions, it is clear that the purposes of such religious-affiliated schools is, in substantial part, to teach and thus advance a given religious faith. The Supreme Court has "long recognized that religious schools pursue two goals, religious instruction and secular education", Board of Education v. Allen, supra, 392 U.S. at 245, 88 S.Ct. at

1927; that, further, "the raison d'être of parochial schools is the propagation of a religious faith". Lemon v. Kurtzman, supra, concurring opinion of Justice Douglas, 403 U.S. at p. 628,[1] 91 S. Ct. at p. 2118. Accordingly, we are satisfied that the nonpublic schools which have participated in the New Jersey Aid to Nonpublic Schools Act are, and will be, for the most part, church-related or religious-affiliated educational institutions.

## SECTION 5 OF THE NONPUBLIC ELEMENTARY AND SECONDARY EDUCATION ACT

Section 5 of the Act (N.J.S.A. 18A:58–63) provides that the New Jersey Commissioner of Education shall reimburse the parents of nonpublic school children for money spent to purchase "secular, nonideological textbooks, instructional materials and supplies".[2] Reimbursement is limited to $10.00 for each pupil in grades kindergarten through eight and $20.00 for each pupil in grades nine through twelve. The cost of textbooks is reimbursable only if the textbooks have been in use within the last five years in a public school in New Jersey, or if they have been approved by the Commissioner of Education as complying with the provisions and purposes of this Act.[3]

▮ At the outset, even though the Establishment Clause was intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity", Walz v.

---

1. For an example of the religious objectives of a religious-affiliated school, excerpts from a pamphlet entitled Philosophy and Objectives of Catholic Education in the Archdiocese of Newark, submitted as a part of the affidavit of Arthur N. D'Italia, disclosed that:

   " * * * The ideals and objectives of Catholic education as well as the curriculum emphasis must then be based upon a Christian form of values.

   *       *       *       *       *

   "Our Catholic tradition is not new; it goes back to the beginning of time. Our schools, therefore, are not man-built—they are God-founded. They have God for their beginning and for their end.

   "The heart of education is religion, for religion is the way to God. * * * "

2. Section 5 provides no definitions. However, it is assumed that the definitions adopted pursuant to the authority granted by N.J.S.A. 18A:58–62 (Section 4) and N.J.S.A. 18A:58–64 (Section 6) are applicable to Section 5. Those definitions are contained in the New Jersey Administrative Code, 6:8–3(j), and provide that: " 'Textbook' means books, workbooks or manuals, whether bound or in loose leaf form intended as a principal source of study material for a given class or group of students, a copy of which is available for the individual use of each pupil in such class or group." In addition, the Administrative Code, in 6:8–3(f), defines instructional materials as follows: " 'Instructional materials' means those items which, with reasonable care and use, may be expected to last for more than one year and are suitable for and are to be used in providing education in secular non-ideological subjects in a nonpublic elementary or secondary school. The term includes such items as tapes and discs, slides and transparencies, films and film-strips, books, pamphlets and periodicals and other printed and published materials such as maps, globes and charts. The term also includes models, graphic materials, materials for duplication, micro-film, instructional kits, and programmed materials. * * * * "

   6:8–3(k) defines supplies as follows: " 'Supplies' means those articles which are appropriate for use in providing education in an elementary or secondary school and which are ordinarily consumed in use by students, including but not limited to such items as pencils, paper, paints, crayons, chemicals, and special supplies used for instruction in home economics, industrial arts, and the like. Excluded are supplies such as role books, marking books, registers, pencil sharpeners, duplicating fluid, and the like which are used primarily for classroom administration or management rather than for instruction."

3. Plaintiffs contend that since the statute grants benefits only to parents of nonpublic school children and not to public school children, it therefore violates the Equal Protection Clause of the Fourteenth Amendment. We do not reach that argument here because of our resolution of these cases on other grounds.

Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970), it is clear that not all legislative programs which may indirectly or incidentally provide some benefit to a religious institution are proscribed by the Establishment Clause.

In Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court permitted New Jersey to devote tax-raised revenues to pay the bus fares of parochial school pupils as part of a general program under which the State paid the fares of pupils attending both public schools and parochial schools.[4] Further, in Board of Education v. Allen, supra, the Court held Constitutional a New York statute requiring local public school authorities to lend textbooks, free of charge, to all students in that state, including those students attending private schools. However, in order not to offend the Establishment Clause, the standards by which such assistance must be measured were restated by the Court in Lemon v. Kurtzman, supra, 403 U.S. at 612–613, 91 S.Ct. at 2111 as follows:

" . . . First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster 'an excessive government entanglement with religion'. Walz, supra, at 674 [90 S.Ct., at 1414]."

Applying these standards to Section 5 of the Act, we find that the statute does, indeed, reflect a secular legislative purpose. In N.J.S.A. 18A:58–60, "Legislative Findings", the statute clearly states that its purpose is to maintain minimum educational standards while reducing the ever-increasing financial burdens on parents who choose private education for their young. This, the statute continues, will insure that a majority of parents of the present nonpublic school population will not remove their children to the public schools, thus imposing an intolerable financial burden on the public at large. "A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate." Lemon, supra, 403 U.S. at 613, 91 S.Ct. at 2111. We therefore conclude that this statute expresses a legitimate secular objective not inconsistent with the Establishment Clause. The application of the last two parts of the Lemon test, however, poses much more difficulty.

Is the principal or primary effect of Section 5 one that neither advances nor inhibits religion?

In Allen, Justice White applied this test to a New York statute which required public school authorities to lend textbooks to private school students. He found, there, that the New York statute satisfied the requirement in that its principal or primary effect neither advanced nor inhibited religion, stating:

"The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." 392 U.S. at 243–244, 88 S.Ct. at 1926. (Emphasis added.)

Reflecting on that determination, the Supreme Court, in Lemon, 403 U.S. at 616–617, 91 S.Ct. at 2113, observed that:

"Our decisions from Everson to Allen have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials. Bus

---

4. In Everson, supra, 330 U.S. at p. 16, 67 S.Ct. at p. 512, Justice Black, writing for the Court, suggested that the New Jersey program approved by the Court there "approaches the verge of [the state's constitutional] power"; Justice Black also authored a vigorous dissent in Allen, supra, at 392 U.S. at p. 250, 88 S.Ct. 1923.

transportation, school lunches, public health services, and secular textbooks supplied *in common to all students* were not thought to offend the Establishment Clause." (Emphasis added.)

While there are obviously a number of differences between the legislative designs examined in *Allen* and *Everson* and that of Section 5, the most fundamental difference—in an Establishment Clause setting—arises from the fact that, unlike the legislative programs in *Allen* and *Everson*, the assistance provided by Section 5 is not extended to parents of all students but only to a special class; that is, to the parents of children who attend nonpublic schools which are, as we have noted, primarily religiously oriented.[5]

While it is true that Section 5 requires the materials provided thereby to be used only for nonideological, secular purposes that limitation is merely designed to assure that the State's aid will not be diverted from a secular function in a religious institution to a religious function, which result would clearly violate the Establishment Clause. The presence of such limiting language is, however, not alone determinative of the primary or principal effect of that legislation. The entire thrust of the aid provided by Section 5 is directed exclusively toward parents whose children are enrolled in nonpublic, primarily religious academies.

Accordingly, because the language of Section 5 limits the assistance provided therein only to parents of children who attend nonpublic, predominately religiously-affiliated schools and not to parents of all school children, we are satisfied that its primary effect is to advance religion and that it is thereby unconstitutional.

Additionally, Section 5 is unconstitutional because it can only lead to excessive government entanglement with religion. The Section authorizes reimbursement to parents for "instructional material and supplies". Without State supervision, these instructional materials and supplies could be used for religious purposes. But the State supervision which would be necessary to assure that these materials were not so used would certainly foster the interference which would constitute excessive entanglement under *Lemon.* See our discussion at p. 39, infra. And the fact that the State may in certain instances have to inspect school records to check the accuracy of the verified statements provided by the school under paragraph (b)(2) of Section 5 also offers potentiality for entanglement. *See, generally,* Lemon v. Kurtzman, supra, 403 U.S. at 620, 91 S. Ct. 2105.

## SECTION 6 OF THE NONPUBLIC ELEMENTARY AND SECONDARY EDUCATION ACT

Section 6 of the Act (N.J.S.A. 18A:58–64) provides:

"In addition to the provisions of section 5 above (18A:58–63), the commissioner shall provide, within the limits of the funds made available by the Legislature, such supplies, instructional materials, equipment and auxiliary services as are requested by the nonpublic school. The board shall adopt guidelines and procedures under which such supplies, instructional materials, equipment and auxiliary services shall be provided. Ownership of the nonconsumable supplies and instructional materials and equipment provided pursuant to this act shall remain in the State Department of Education."

---

5. Public school children in New Jersey are merely borrowers of their books, while this statute reimburses the purchase of textbooks by the parents of those students attending nonpublic schools. Thus, this statute produces a situation where parents who send their children to nonpublic schools receive monetary reimbursement, while public school children are merely borrowers. This results in a special program for a delineated group. See N.J.S.A. 18A:34–1: "Textbooks shall be . . . and they and other school supplies shall be furnished free of cost for use by all pupils in the public schools . . ."

The State characterizes the aid provided for in this Section as being, in part, a loan to nonpublic schools, emphasizing that the title to the nonconsumable articles allotted to the schools is retained by the State.[6] While labelled, in part, as a loan, the legislative proposal in its entirety more nearly resembles a direct grant of public funds to nonpublic, predominantly religiously affiliated schools. While it is true that title to the nonconsumable materials, supplies and equipment is retained by the State, the arrangement is a loan in name only. The nonconsumable items are allocated indefinitely to the schools, and presumably for their useful lives. More importantly, however, all of the aid under this Section, although intended for the use and benefit of nonpublic school children, is made by the State directly to the local boards of education, which then, under the legislative scheme, either lend or provide the requested items or services to the schools. The fact that the local board of education is the conduit through which the aid is distributed is not determinative of the nature of such aid. In essence, the board of education still directly provides materials and services to nonpublic schools which are paid for by State funds. In *Lemon*, supra, 403 U.S. at 621, 91 S.Ct. at 2115, the Supreme Court, striking down a Pennsylvania statute which provided reimbursement to nonpublic schools for teachers' salaries, textbooks and instructional materials, observed that the statute:

" . . . has the further defect of providing state financial aid directly to the church-related school. This factor distinguishes both *Everson* and *Allen,* for in both those cases the Court was careful to point out that state aid was provided to the student and his parents—not to the church-related school. Board of Education v. Allen, supra [392 U.S.], at 243–244 [88 S.Ct., at 1926–1927]; Everson v. Board of Education, supra [330 U.S.,] at 18 [67 S.Ct. at 512]."

Furthermore, that which Section 6 contemplates does not remotely resemble the "loan" involved in the *Allen* case. *Allen* permitted the lending of textbooks to parochial-school children as part of a general program for the lending of textbooks to all children. Here, funds are provided by the Legislature for a special class of schools, most of which are religious affiliates.

The regulations promulgated to implement Section 6 provide that "within the limits of funds available, the Commissioner shall establish * * * an allotment of funds for each nonpublic school". N.J.Admin.Code 6:8–2(a). This "allotment of funds authorized to the nonpublic schools shall [then] be available for [the] use of the nonpublic schools . . ." N.J.Admin.Code 6:8–2(i). These private institutions can then draw on their allotment in any manner consistent with the Act. Once having done so, " * * * payments for auxiliary services shall be made directly to the [local] board of education providing such services". N.J.Admin.Code 6:8–2(f). In short, a nonpublic school orders supplies, services, materials, or equipment; the order is approved; a deduction is then made from that school's authorized allotment, and the State transfers funds to pay for the appropriated items to the local board, which then provides that which the school has requested. Whether or not it is described, in part, as a loan, to us this is indistinguishable from a direct grant of public funds, held unconstitutional in *Lemon*.

6. N.J.Admin. Code 6:8–2(e), provides that:
"Title to all instructional materials, equipment and nonconsumable articles acquired under this Act shall rest only in the New Jersey State Department of Education and shall be available for use by children and teachers in nonpublic schools on a loan basis only. All instructional materials and equipment made available for use in nonpublic schools must be stamped or otherwise labeled 'Property of the State of New Jersey'."

Plaintiffs contend, further, that the administration of Section 6 will result in an excessive entanglement of church and state and thereby violate the third standard set forth in *Lemon*.

The allocation of public funds is invariably accompanied by limitations and restrictions on the use of such funds, in order to insure that the legislative intent is satisfied. Having imposed such limitations and restrictions, the State must enforce them. In Walz v. Tax Commission, supra, 397 U.S. at 675, 90 S.Ct. at 1414, the Court warned of the dangers of direct payments to religious organizations, observing that:

"Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards. . . ."

Here, the New Jersey Legislature could not, and did not, provide for such aid to nonpublic schools simply on the assumption that the materials provided would not be used for religious purposes. The language of 18A:58–62 specifically provides that " * * * the board shall not, under the provisions of this act, provide services, materials or programs, for use in sectarian religious courses or devotional exercises * * * ". These prohibitions were certainly not included merely to permit this legislation to pass Constitutional muster. They were included to be observed.

In order to facilitate the discussion of the entanglement contention, we will consider separately the provisions in Section 6 for "supplies", "instructional materials" and "equipment" from those for "auxiliary services".

The definitions of "supplies" and "instructional materials" are the same as set forth in the footnote relating to our discussion of Section 5. "Equipment", as it is set forth in Section 6, is defined in N.J.Admin.Code 6:8–3. "Equipment" means: "mobile or portable articles which are particularly appropriate for use in providing education in academic subjects in an elementary or secondary school and which are to be used either by teachers in connection with teaching or by students in learning secular nonideological subjects. The term excludes such items as general purpose furniture, radio or television broadcasting apparatus and school public address systems. Equipment consists of, but is not limited to, the following items:

Projectors-film, filmstrip, slide, and the like.
Projectors-overhead, opaque.
Viewers-filmstrip, slide.
Television receivers.
Record players-disc, tape.
Tape recorders-audio and video.
Radio receivers.
Portable listening stations.
Portable projection screens.
Cameras-movie, still, video.
Micro-reader and/or printer.
Copying and/or duplicating machines.
Typewriters.
Transcribing-recording apparatus.
Microscopes.
Reading accelerators.
Tachistoscopes.

"Various apparatus and equipment used for instruction in science and math, physical education, art, music, industrial arts, home economics, and business and commercial subjects. Excluded are any items of equipment, whether listed above or not, used for any purpose other than instruction in a classroom. Excluded also are any items of equipment which are not portable and which require permanent installation."

Although it is obvious that "supplies", "instructional materials", and "equipment" are inherently neutral, the uses to which they can be put are clearly varied.

Most of these items obviously can be used with equal facility in the teaching of religious studies as well as they can be used for the teaching of secular-nonideological subjects.[7]

To see to the enforcement of the legislative intent—given the obvious adaptability of "supplies", "instructional materials" and "equipment"—a constant and continuous review and control of the manner in which such supplies, instructional materials and equipment are utilized would have to be undertaken. It is this necessity, then, to enforce the limitations on the use of the funds which will forever demand a State involvement and a continuing and intolerable Government presence in the affairs of a church. Accordingly, we find that that part of Section 6 which provides for the supplying of "instructional materials", "supplies", and "equipment" to be Constitutionally infirm, in that it would involve entanglement between the church and State which the Establishment Clause of the First Amendment was intended to avoid.

The "auxiliary services" referred to in Section 6 are defined in 6:8–1.3 of the New Jersey Administrative Code "as nonadministrative services provided by personnel other than regular classroom teachers, school librarians, principals or other supervisory personnel to students whose special needs are not met in a standard or regular school program. Auxiliary services are limited to services, usually described as, or similar to, the following:

Remedial and corrective instruction and diagnostic services in reading and mathematics.

Corrective instruction in speech.

Adaptive or corrective instruction in physical education.

Guidance counselling and testing services.

Psychological testing and diagnostic services.

School nursing and health services." Section 6:8–2(f) limits auxiliary services as follows:

"Auxiliary services as defined herein shall be limited to those which are currently provided to the students of the public school district in which the nonpublic school is located. Such services are to be provided on the basis of mutually satisfactory arrangements between the nonpublic school and the local board of education. Both the nonpublic school and the local board of education shall make good faith efforts to reach these mutually satisfactory arrangements. Except for reasons beyond its control, the local public school board of education shall provide eligible auxiliary services as defined herein if requested by the nonpublic school. Such eligible auxiliary services provided to the nonpublic school shall be equivalent to, and under conditions similar to, those provided in the local public school. If requested services cannot be provided, the local public school board shall give the reasons. Personnel providing such services must:

1. Be employees of the board of education at the time the services are provided;

2. Be certified by the State Board of Examiners if such certification is required of similar personnel assigned to public schools;

3. Be under the supervision of the local board of education.

The request for authorization to acquire auxiliary services shall be accompanied by a statement signed by a responsible official of the board of education indicating agreement to provide auxiliary services and the terms and conditions of such agreement. Payments for auxiliary services shall be made directly to the board of education providing such services."

7. Books, on the other hand, can be easily examined once as to content—and are not as adaptable to this use as supplies. *Allen*, supra.

The defendants argue that no surveillance would be required to enforce State limitations in the auxiliary program because the processes which would be involved in remedial reading or remedial arithmetic are clearly more peripheral to the possibility of religious indoctrination than the initial teaching of reading and arithmetic. Even though this argument is sound, to a degree, a teacher who teaches reading or remedial reading remains a teacher. A teacher's instruction may vary in content or emphasis and is not entirely predictable. A teacher is not a textbook, the contents of which remain constant, as the Court recognized in *Lemon*, stating:

> "We cannot, however, refuse here to recognize that teachers have a substantially different ideological character from books. In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not." *Lemon*, supra, 403 U.S. at 617, 91 S. Ct. at 2113.

This being so, it would be necessary to continually review the content of a teacher's instruction in order to see that it adheres to the restrictions imposed by the statute, in that it be confined only to secular and nonideological subject matter.

Moreover, it is clear that the teachers providing such auxiliary services will be functioning within the confines and environment of a given religious institution where a religious atmosphere may be pervasive. Although the teachers of auxiliary services are not employed by a religious organization and are not directly subject to the direction and discipline of a religious authority, they will, nonetheless, be working in atmospheres dedicated to the rearing of children in a particular religious faith. Again it would seem that a constant review of that instruction would be required in order to determine that the religious atmosphere has not caused religion to be reflected—even unintentionally—in the instruction provided by such teachers. Furthermore, the arrangement may provoke some controversy, as noted in *Lemon*, between the auxiliary teachers and the religious authority over the precise meaning and extent of the legislative restraints. See Lemon v. Kurtzman, supra, 403 U.S. at 619, 91 S.Ct. 2105. Finally, the legislative program suggests yet another possibility of church-state entanglement. The answer to Question 1 contained in a statement of the Office of Non-Public School Secular Education entitled "Information Concerning the Implementation of the Non-Public Elementary and Secondary Education Act for 1972–73" states that:

> "The Department of Education construes the language of the regulations to mandate by implication, a good faith effort on the part of both parties to reach an agreement. [Agreement as to the auxiliary services to be provided.] Agreement may not be avoided on grounds which are arbitrary and unconnected with sound educational policy. In the event an agreement to provide auxiliary services cannot be reached, the public school board should be prepared to give reasons."

This contingency statement recognizes that the local board and the nonpublic school will necessarily be involved in negotiations. This is more than a mere mechanical involvement. The local board, in order to adhere to the statutory restrictions imposed, would be required, it would seem, to inquire into the religious procedures and curricula of the nonpublic school. The possibilities of disagreement arising from such an inquiry suggest the production of future state-church areas of disagreement, which is exactly what the holding in *Lemon* seeks to avoid. Accordingly, we hold that part of Section 6 which provides for auxiliary services is unconstitutional by reason of the church-state administrative entanglement it would produce.

Alternative but equal grounds for invalidation of both Section 5 and Section

6 of this statute exist. The Supreme Court, in *Lemon*, recognized that the statutes involved there possessed elements likely to produce divisiveness in the body politic prompting an impermissible entanglement of the church and state in a political sense. The Court commented that while "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, . . . political division along religious lines was one of the principal evils against which the First Amendment was intended to protect . . . The potential divisiveness of such conflict is a threat to the normal political process . . . To have States or communities divide on the issues presented by state aid to parochial schools would tend to confuse and obscure other issues of great urgency". *Lemon*, supra, 403 U.S. at 622, 91 S.Ct. at 2116.

Additionally, the Court concluded that "The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow". *Lemon*, supra, at 623, 91 S.Ct. at 2116.[8] The seeds of such conflicts are surely present in the New Jersey Act.

This nation has avoided much of the divisiveness attendant upon differences of religion because of our separation of the secular from the sectarian. This precept necessarily reduces the possibility that a harmful conflict between religious beliefs might enter the political arena. Yet, the inevitable and successive funding of institutions of which a substantial majority are religious affiliates, threatens this salutory division.[9] The Supreme Court has recognized the unfortunate consequences of such an intrusion, which we believe applicable to this New Jersey setting. In *Lemon*, at 622, 91 S.Ct. at 2115, the Supreme Court stated that:

> "[I]n a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith."

Thus, it is the funding of basically religious institutions, being successive and repetitive, which would invite seasonal controversy and confrontation between proponents and opponents of such action. The injection of the absolutes and moral

8. The annual appropriations under the New Jersey statute have doubled in one year, from 9.5 million in 1972 to 19 million dollars in 1973.

9. As to successive state grants to religious institutions, in Lemon v. Kurtzman, D.C., 310 F.Supp. 35 (1969), Judge Hastie, in dissent, observed:

> "[I]t is reasonable to anticipate continuing political controversy in every state and local community whether and to what extent public funds are to be granted to subsidize a large number and a broad range of activities of religious organizations. Leaders and devout members of various organized religious groups will see it as their duty to their church or sect to seek such aid and to insist that state and local government contribute liberally to their sectarian enterprises. Legislators, government executives and candidates for elective office in whose judgment other claims upon the public purse merit higher priority can anticipate political opposition as enemies of the faith. In this way religion and politics will become *in pari materia*".

imperatives implicit in the propogation of any faith would work an inevitable distortion in the spirit of compromise and the acceptability of political differences which is characteristic of our political system. It is just such an eventuality that the framers of the First Amendment sought to avoid.[10]

Further, we feel this escalating type of state aid would bespeak the invasion of secular authorities into the affairs of organized religion. Instead, its proponents argue that such a relationship between church-affiliates and the state would be beneficial to both parties, their theory being that aid to nonpublic schools, keeping those entities viable, would reduce the full cost of education which the state would otherwise be forced to assume. Yet the exigencies of increasing costs and further specialization of curricula seem to make this relationship a less than stable one. As costs increase, increases in state aid will be sought. As more and more programs and personnel are reclassified from sectarian to secular, inevitably the unhappy by-products of state censorship and control will begin to intrude into what was originally labeled simply as financial relief. Money, as we have noted, is seldom appropriated without some restraints, and, indeed, even the most narrow view

of the Establishment Clause will admit the necessity of some regulation of school aid. Where such restraints lead is aptly illustrated by New Jersey's attempt. Even this limited aid improperly propels the state into matters of nonpublic educational administration and content in which it does not belong. Thus, for the continued vitality and freedom of these academies, which we deem so valuable, and for the continued advancement and strengthening of our society, this encroaching entanglement cannot be permitted.

Thus, for the reasons enumerated above, we find that the Act would create excessive entanglement of a political nature and is, thereby, unconstitutional.[11]

## CONCLUSION

■ For the reasons set forth herein, we are satisfied that the plaintiffs have made a strong showing that they will prevail on the merits, and that such a showing, involving, as it does, a First Amendment claim, in itself constitutes irreparable harm. "In cases involving a claim by movant of interference with protected freedoms or other constitutional rights, the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or

10. During the course of oral argument, the plaintiffs mistakenly interpreted a remark of the Court made at oral argument as indicating that the Court had taken judicial notice that "a climate suggesting political division along religious lines" was engendered by the Act. The Court did not take judicial notice of any such fact. We did, however, in this connection, consider the affidavits of Theodore Grandberg and Marjorie Yospin, submitted by the plaintiffs, which described a special public meeting of the Board of Education of Elizabeth to consider a budget, which included approximately $500,000.00 for auxiliary services for nonpublic schools. The meeting was characterized as involving "bitter charges and countercharges expressed along religious lines" and as "heated".

11. The reliance placed by the defendants on the holding of the Supreme Court in

Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), we think, is misplaced because the factual pattern is dissimilar to that of *Lemon* or of this case. The Court determined that in the church-related colleges involved in *Tilton* there was less likelihood than there was in primary and secondary schools, involving impressionable children, that religion would permeate secular education and the necessity for intensive Government surveillance was thereby diminished. Further, the Court found that Government entanglements with religion were reduced because the aid in *Tilton* was for a one-time, single-purpose construction grant, and that the facilities provided by the Government were themselves religiously neutral. Cumulatively, the Court held that these factors substantially lessened the potential for divisive religious fragmentation in the political arena.

**43**

at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment." Delaware and Hudson Railway Co. v. United Transp. Union, 146 U.S.App.D.C. 142, 450 F.2d 603, 619, 620 (1971). Having sustained the viability of this action on Establishment Clause grounds, we therefore necessarily decided that the deprivation of the rights guaranteed by the First Amendment would in all likelihood be ultimately established. The deprivation of such a fundamental Constitutional right constitutes irreparable harm. Lewis v. Kugler, 446 F.2d 1343, 1350 (3rd Cir. 1971); Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969); Green v. Kennedy, 309 F.Supp. 1127, 1139 (D.D.C.1970); Fortune Society v. McGinnis, 319 F.Supp. 901, 903 (S.D.N.Y.1970); Delaware and Hudson Railway Co. v. United Transp. Union, supra, 450 F.2d at 619, 620; Hairston v. Hutzler, 334 F.Supp. 251, 254 (W.D.Pa. 1971).

■ While it is true that the granting of a preliminary injunction here will terminate what we have determined to be unconstitutional benefits to the nonpublic schools and very likely make it impossible for them to extend the various programs and services envisioned by the Act to their students, we are persuaded that these considerations may not be regarded as paramount when weighed against an abridgement of the First Amendment of the Federal Constitution.

Finally, it is clear to us that the interest of the public lies not so much in the continuation of aid to nonpublic schools as it does in the continued vitality of the Establishment Clause.

Accordingly, the defendants, their agents, employees, and successors in office, are preliminarily enjoined from disbursing further funds under N.J.S.A. 18A:58–59 et seq., and from otherwise participating in the administration or execution of that Act. Defendants' motion to dismiss the complaint for its fail-

ure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), is denied.

An appropriate order, consistent with this opinion, will be submitted.