Albert C. WALKER; Roberta Walker, Leon Ilnicki; Juanita Ilnicki, John C. Soso; Jacklyn C. Soso; Margaret Smith, Alyce Crosdale, and Betty Sands, Plaintiffs,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, City and County of San Francisco, State of California; Board of Education of the San Francisco Unified School District, City and County of San Francisco, State of California; Ramon Cortines, Superintendent of Schools, San Francisco Unified School District; William Honig, as California Superintendent of Public Instruction; California Department of Education; California State Board of Education; John R. Quinn, Archbishop of the Archdiocese of San Francisco, individually and as a Corporation Sole; Archdiocese of San Francisco; Mt. St. Joseph–St. Elizabeth; Lauro F. Cavazos, as Secretary of the United States Department of Education,[1] Defendants.

and

Deborah Martin; Jacob Perea; and Barbara Perea, Intervenor–Defendants.

No. C–86–6430 WHO.

United States District Court, N.D. California.

June 6, 1990.

---

**1.** Lauro F. Cavazos has succeeded William J. Bennett as Secretary of the United States Department of Education. Accordingly, the Court *sua sponte* changes the case caption to Lauro F. Cavazos, Secretary of the United States Department of Education.

Claude Morgan, Sacramento, Cal., Lee Boothby, Boothby, Ziprick & Yingst, Berrien Springs, Mich., for plaintiffs.

Louise H. Renne, City Atty., Dennis Aftergut, Burk E. Delventhal, Randy Riddle, Deputy City Attys., San Francisco, Cal., for defendants San Francisco Unified School Dist. and Ramon Cortines.

Roger Wolfertz, Legal Office, State Dept. of Educ., Sacramento, Cal., for State defendants.

Paul E. Gaspari, Lawrence R. Jannuzzi, Tobin & Tobin, San Francisco, Cal., for The Roman Catholic Archbishop of San Francisco.

Frank D. Tatum, Jr., Paul J. Laveroni, Mark D. Skilling, Cooley Godward Castro Huddleson & Tatum, San Francisco, Cal., for Mt. St. Joseph–St. Elizabeth.

Stuart M. Gerson, Asst. Atty. Gen., Joseph P. Russoniello, U.S. Atty., Stephen Schirle, Asst. U.S. Atty., San Francisco, Cal., Brook Hedge, Theodore C. Hirt, Eric J. Segall, Attys., Civ. Div., Dept. of Justice, Washington, D.C., for U.S. Dept. of Educ. and Lauro F. Cavazos, Secretary.

Charles H. Wilson, Laura P. Masurovsky, William & Connolly, Washington, D.C., Gregory Ryken, Jacobs, Spotswood & Ryken, San Francisco, Cal., for intervenor-defendants.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, resident California state and federal taxpayers, filed a declaratory relief action against defendants[2] alleging that the manner in which remedial educational services are provided to students attending sectarian schools in the San Francisco Unified School District, pursuant to Chapters 1 and 2 of the Education Consolidation and Improvement Act of 1981 ("ECIA"), 20 U.S.C. §§ 3801 *et seq.*,[3] violates the Establishment Clause of the First Amendment to the Constitution of the United States.[4]

The parties filed two sets of cross-motions for summary judgment. The first set of cross-motions addresses the question of whether the San Francisco Unified School District's involvement in and use of Chapter 1 negligent and delinquent funds, as well as California General Education Funds,[5] at Simpatico School, violates the Establishment Clause of the Constitution of the United States as well as the prohibition in the Constitution of the State of California against the use of state funds to aid any religious group or institution. The second set of cross-motions addresses the question of whether Chapter 2 is unconstitutional on its face, or as implemented in the San Francisco Unified School District.

After consideration of the briefs, the numerous declarations, and documentary evidence filed by the parties, and hearing oral argument, for the reasons set forth herein, the Court grants defendants' motion for summary judgment with respect to Simpatico School, grants defendants' motion for summary judgment with respect to Chapter 2, and denies plaintiffs' motions with respect to Simpatico School and Chapter 2. The Court discusses the claims and arguments of the parties with respect to each motion separately, beginning with Simpatico School.

### I.

### A.

### 1.

Simpatico School ("School) occupies the second floor of a building located at 100 Masonic Street in San Francisco that serves as a residential home for pregnant teenage girls. The residential home is one of three "group homes" run by defendant Mount St. Elizabeth–St. Josephs ("Mount"),

---

**2.** Defendants San Francisco Unified District, Board of Education of the San Francisco Unified School District, Ramon Cortines, Superintendent of Schools, San Francisco Unified School District, William Honig, California Superintendent of Public Instruction, California Department of Education, and California State Board of Education are the state and local educational agencies and titular authorities responsible for implementing Chapters 1 and 2 of the Education Consolidation and Improvement Act of 1981 ("ECIA") in San Francisco. Lauro F. Cavazos, Secretary of the United States Department of Education, is titular authority of the federal educational agency responsible for implementing ECIA. Defendant John R. Quinn, Archbishop of the Archdiocese of San Francisco, is titular authority of the Archdiocese of San Francisco, some of whose sectarian school students are recipients of ECIA funds. Mount St. Joseph–St. Elizabeth is a nonprofit charitable organization that runs a residential home for pregnant teenage girls known as Simpatico School, which operates under the guidance of the San Francisco Unified School District and with the assistance of public funds. Intervenor-defendants, Deborah Martin, Jacob Perea, and Barbara Perea, are parents of children attending private sectarian school in the District.

**3.** Chapter 1 of the ECIA superseded Title I of the Elementary and Secondary Education Act of 1965 ("ESEA"). 20 U.S.C. § 2701 *et seq.* Chapter 2 of the ECIA consolidated a number of federal educational programs into a single "block grant" to the various states eligible for funds. 20 U.S.C. § 3811(a).

Effective April 28, 1988, Chapters 1 and 2 were superseded by Title I of the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, Pub.L. 100–297, 102 Stat. 140 (1988), 20 U.S.C.A. § 2701 *et seq.*, which reauthorized Chapters 1 and 2. Because all of the prior pleadings in this case and the evidence in the record identify the programs as "Chapter 1" and "Chapter 2," those designations were used in the motions.

**4.** Amendment I of the Constitution of the United States provides in pertinent part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....

**5.** California General Education Code § 2551.3 covers pregnant minors programs operated by county superintendents of schools.

a nonprofit charitable corporation organized under California law. The Mount is affiliated with the Daughters of Charity of St. Vincent de Paul, a religious organization.

The Mount provides residential care and psychological counseling to girls who are pregnant, or have emotional and educational disabilities, or both. Some of the girls are committed to the Mount's care by the Department of Social Services and by Probation Departments of counties throughout Northern California. Others are referred by public and private agencies and voluntarily choose to reside at the Mount. The Mount also provides infant care for children of resident girls.

The girls who attend the School do so because of emotional and psychological handicaps that make it impossible for them to leave the closed-campus environment of the School to attend classes at a San Francisco Unified District ("District") school. Many of the girls were placed in the Mount program because of problems they experienced at their previous open-campus schools. Others, being pregnant and unmarried, are at the Mount to obtain support needed to cope with their pregnancies in an environment where their conditions are not stigmatizing.

2.

The School program is conducted Monday through Friday, from 8:45 a.m. to 2:45 p.m. There are presently eight staff members. Five of the employees, who include the Director of Education ("Director") and four teachers, are paid by the Mount. One teacher is paid by the District with General Education Funds for Special Service Centers. One paraprofessional is paid from Chapter 1 negligent and delinquent funds. 20 U.S.C. § 2801. One clerk typist, who works three hours per day, is paid for one hour with Chapter 1 funds, 20 U.S.C. § 2801, and for two hours by the Mount.

The curriculum mirrors that of the District and is entirely secular. The School does not offer instruction in theology of any faith, either before or after school hours, and it does not require obedience of the girls to doctrines of a particular faith.

Teaching religious values is not a part of the curriculum. Only secular books are used. The teachers teach according to objective, secular academic standards. The School sponsors no religious activities, and does not require the girls to attend religious activities. There are no prayers during classes and no prayers during graduation ceremonies. The classrooms are free of sectarian symbols. There are no religious restrictions on the admission of girls and religious criteria play no role in determining who is employed at the School. None of the teachers are members of a religious order. The girls have diverse religious preferences, if they have them at all. The percentage of girls who expressly declared an affiliation with the Roman Catholic Church averaged thirty-three percent during the 1985–88 period. During that same period forty percent of the students expressed no religious preference. Other faiths represented in significant numbers include Baptists and Methodists.

The School receives no funding from the Daughters of Charity, the Catholic Church, defendant Archdiocese of San Francisco, or from any other religious organization. All funds come from the state, community fund raising, grants, and foundations. The School is not controlled by any religious group, nor does it have as one of its objectives the inculcation of any religion.

3.

The District controls all essential operations of the School, and determines the curriculum, academic schedule, number of class hours, and holidays. It ensures that the instruction is consistent with its curriculum requirements by regularly forwarding Weekly Administrator's Directives ("WADs") and Curriculum Guides to the School. The WADs and Curriculum Guides set forth in great detail descriptions of the classes that must be offered and the requirements students must satisfy to graduate.

The District makes the assignment of District teachers to the School, and evaluates their performance, in cooperation with the Director of the School. As part of the teachers' training, they learn that they are

not to advance the religious beliefs of any particular religion. District rules that apply to the School direct that no sectarian or denominational doctrine be taught.

The School orders its textbooks from a list of state-approved textbooks provided by the District. Educational materials purchased with District funds are purchased directly from the District. Teachers at the School are free to use the District's Teachers Professional Library, to borrow District instructional materials, and to consult with District teachers on work-related issues.

The School subscribes to high school graduation requirements set by the District, which provide that students are to complete a set number of credits before graduating. The students graduating at the high school level receive diplomas identical to those received by District students.

The Director of the School performs a role similar to that of a principal at District schools. She is charged with ensuring that the District's curriculum requirements, as set forth in the WADs and Curriculum Guides, are followed. She assists in the District's evaluation of the teachers assigned to the School, just as District principals do. The standards used by the Director in evaluating teachers are found in the Handbook for Performance Appraisal System provided by California's Civil Service Commission. The Director's salary is paid by the Mount, and she reports to both the District and the Mount.

4.

As noted above, the central purpose of the Mount is secular, namely, to make available residential care and psychological counseling to girls who are pregnant, or who have emotional and educational disabilities, or both. The legal character of the Mount is purely secular. Its articles of incorporation set forth no religious purposes. They provide, in part, that the "specific and primary and exclusive purposes for which [the Mount] is formed and organized are for charitable purposes." Supporting Exhibits of Defendant Mount St. Joseph–St. Elizabeth, Vol. I, Articles of Incorporation, Article II, filed Nov. 18, 1989. All funding for the Mount comes from the state, community fund raising, grants, and foundations. It receives no funding from any religious organization, including the Daughters of Charity, the Roman Catholic Church, or the Archdiocese of San Francisco.

Religious activities that go on at the Mount are optional and the girls rarely attend. These activities have been made available pursuant to Title XXII, California Code of Regulations § 80072(5), which provides that children residing at institutions like the Mount are free to attend religious services and to have visits from a spiritual advisor of their choice.

There are several religious symbols at the Mount but, with the exception of a statue in the garden, they are confined to the administration wing and the corridor connecting this wing to the building housing the School. The girls do not pass these symbols in order to get from their rooms to the School.

The directors and corporate members of the Mount are members of the Daughters of Charity. The Executive Director of the Mount is appointed by the corporate members. The Executive Director need not be a member of any religious order or of any religion.

5.

The Daughters of Charity are a separate legal entity from the Mount and have no involvement in the operation of the School. Pursuant to an agreement with the Mount, the Daughters of Charity live in a residential facility attached to a building in which the School is located. This facility is strictly off limits to the girls who reside at the Mount. The Mount has an agreement with the Daughters of Charity whereby it has agreed to hire qualified Daughters of Charity sisters to work at the Mount at prevailing rates.

At the present time, the only sisters employed by the Mount provide nursing care for the girls, the girl's babies, and the cocaine-addicted babies placed at the Mount, or work in the Mount's administration.

B.

1.

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court considered a constitutional challenge to a state statute authorizing expenditures of public funds at a nonpublic, church-affiliated school. The Court stated that:

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen*, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion. *Walz* [*v. Tax Commission*, 397 U.S. 664], 674 [90 S.Ct. 1409, 1414, 25 L.Ed.2d 697]."

*Id.* at 612–13, 91 S.Ct. at 2111.

The three tests identified by the Supreme Court in *Lemon* for evaluating the constitutionality of governmental actions under the Establishment Clause have come to be known as the three-prong *Lemon* test.

In the present case, there is no dispute that the government involvement in the School has a secular legislative purpose. Only the second and third prongs of the *Lemon* test are in dispute.

2.

Analysis of the second and third prongs of the *Lemon* test generally begins with the question of whether the benefiting institution can be characterized as "pervasively sectarian." If an institution is deemed to be "pervasively sectarian," then it will almost always be determined that the primary effect of the aid will be to advance religion. But when the benefiting institution is found not to be "pervasively sectarian," when considering the "primary effect" of the government aid, it is presumed that the aid will be used in compliance with the Constitution. *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 760, 96 S.Ct. 2337, 2351, 49 L.Ed.2d 179 (1976); *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

An institution is pervasively sectarian if it is an institution "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission ...," *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973), or if it is an institution " 'so permeated with religion that the secular side cannot be separated from the sectarian.' " *Roemer*, 426 U.S. at 759, 96 S.Ct. at 2351, *citing Roemer v. Board of Public Works of Maryland*, 387 F.Supp. 1282 at 1293 (D.Md.1974).

In *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Supreme Court relied on a profile adopted by the district court of pervasively sectarian institutions. According to this profile, such an institution is one that (1) imposes religious restrictions on admissions, (2) requires attendance of pupils at religious activities, (3) requires obedience by students to the doctrines of a particular faith, (4) requires pupils to attend instruction in the theology of a particular faith, (5) is an integral part of the religious mission of a sponsoring church, (6) has as an integral substantial purpose the inculcation of religious values, (7) imposes religious restrictions on faculty appointments, and (8) imposes religious restrictions on what or how the faculty may teach. *Id.* at 767–68, 93 S.Ct. at 2962–63.

The School does not have any of these characteristics. As noted above, and repeated for emphasis, the School imposes no religious restriction on admissions, does not require attendance at religious activities, does not require obedience of students to the doctrine of a particular faith, does not provide theological instruction, does not inculcate religious values, and imposes no religious restrictions on faculty appointments or on what or how the faculty may teach.

The School is best characterized as a nonsectarian school that receives both pri-

vate and public funds. Given the nonsectarian nature of the School, the Establishment Clause is not even implicated by the use of public funds or the District's involvement at the School.

Legal analysis on these motions could stop here. Plaintiffs, however, have argued that the focus of the Court should be on the Mount as a whole rather than on the School alone. The public funds and District involvement are directed solely at the School. The School is the benefiting institution in this case. Therefore, the Court's focus is correctly on the School itself.

Even if the Court viewed the Mount as the benefiting institution, however, considering the nature of the Mount as a whole, it could not be characterized as a "pervasively sectarian" institution. The Mount's purposes are primarily charitable, not religious. It does not have as an integral part of its mission the inculcation of religious values. It imposes no religious restrictions on the admission of the girls who live or the persons who work at the Mount.

Plaintiff's allegations of Establishment Clause violation rest solely on the fact that the School is affiliated with the Mount and that the Mount is affiliated with the Daughters of Charity. No one disputes the fact that the Daughters of Charity are a religious organization. The issue before the Court, however, is whether the benefiting institution is pervasively sectarian. The Supreme Court has observed that "it is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is 'religiously inspired'" in order to find a First Amendment violation. *Kendrick*, 108 S.Ct. at 2580. In fact, in *Kendrick*, the Court noted that "this Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Id.* at 2574. The Court went on to discuss with approval a case decided in 1899, *Bradfield v. Robert*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 in which the Court upheld an agreement between the Commissioner of the District of Columbia and a religiously-affiliated hospital whereby the federal government would pay for the construction of a new building on the grounds of the hospital. The *Kendrick* Court recounted that in *Bradfield:*

> [T]he Court refused to hold that the mere fact that the hospital was "conducted under the auspices of the Roman Catholic Church" was sufficient to alter the purely secular legal character of the corporation, particularly in the absence of any allegation that the hospital discriminated on the basis of religion or operated in any way inconsistent with its secular charter.

*Kendrick*, 108 S.Ct. at 2575 (citation omitted), *quoting Bradfield*, 175 U.S. at 298, 20 S.Ct. at 123.

The School is the benefiting institution in this case. It is nonsectarian. The District is in no way involved with the Daughters of Charity. The Daughters of Charity are not involved in the operation of the School. The educational process at the School is purely secular.

Even if the Court were to view the Mount as the benefiting institution, the mere fact that the School is located at the Mount and it is affiliated with the Daughters of Charity is not enough to make government funding of an otherwise secular school program unconstitutional.

3.

Once it is established that a given institution is not pervasively sectarian, the only issue under the second prong of the *Lemon* test is whether the aid "funds a specifically religious activity in an otherwise substantially secular setting," *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874, or is "extended only to 'the secular side.'" *Roemer*, 426 U.S. at 759, 96 S.Ct. at 2351. There is no question of material fact that the funds supplied to the School are used for secular purposes.

Given the nonsectarian nature of the School, there is no doubt that the primary effect of public aid to the school is to advance a secular purpose. The District's involvement in the School satisfies the second prong of the *Lemon* test.

Plaintiffs' reliance on *School District of the City of Grand Rapids v. Ball*, 473 U.S.

373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1984), to support its view that the primary effect of the District's involvement in the School is to advance religion is misplaced. In *Grand Rapids*, the Court noted that forty of the forty-one schools that had received the government funds at issue were sectarian in character:

> The schools of course vary from one another, but substantial evidence suggests that they share deep religious purposes. For instance, the Parents Handbook of one Catholic school states the goals of Catholic educations as "[a] God oriented environment which *permeates* the total educational program," "a Christian atmosphere which guides and encourages participation in the church's commitment to social justice," and "a continuous development of knowledge of Catholic faith, its traditions, teachings and theology."

*Id.* at 379, 105 S.Ct. at 3217.

This is the type of religious inculcation that is conspicuously absent at the School.

Plaintiffs' discussion of *Americans United for Separation of Church & State v. Porter*, 485 F.Supp. 432 (W.D.Mich.1980), is irrelevant for the same reason. Plaintiffs own recitation of the facts in *Porter* indicate that the school involved there was "parochial." The significant point with respect to this case is that the School is not a parochial school. It is a religiously neutral institution located on the premises of a charitable and religiously-affiliated organization.

### 4.

As with the second prong or "primary effect" aspect of the *Lemon* test, the third prong or "excessive entanglement" aspect requires the Court to give primary consideration to the question of whether the benefiting institution is pervasively sectarian. As discussed above, neither the School nor the Mount are pervasively sectarian.

In *Roemer*, the Supreme Court observed that when an institution is pervasively sectarian, it is impossible for the state to identify and subsidize separate secular functions without monitoring the use of that aid. 426 U.S. at 765, 96 S.Ct. at 2353.

On the other hand, the Court has also noted that when an institution is not pervasively sectarian, the need for the state to monitor the aid is "substantially reduced." *Id.* at 762, 96 S.Ct. at 2352.

In this case, the District controls the School's operations by regularly forwarding WAD's and Curriculum Guides to the School. The WADs set forth District policies, school calendars, District-sponsored educational programs, and teacher training classes. The Curriculum Guides include course materials and reference sources. There is no indication that public funds have been used for any nonsecular purpose. Because neither the School nor the Mount are pervasively sectarian, the involvement of the District in the School does not lead to excessive entanglement between church and state. Defendants have satisfied the third prong of the *Lemon* test.

As part of their argument with respect to excessive entanglement, plaintiffs argue that the District has unlawfully delegated its powers to the Mount. In an attempt to make out an argument of improper delegation of government authority, plaintiffs cite *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), a case in which the Court found that Massachusetts had unlawfully vested authority in churches by creating a statute prohibiting alcoholic beverage licensing to premises in the proximity of a church, if the church objects. Plaintiffs cite *Larkin* for the proposition that:

> [T]he core rationale underlying the Establishment Clause is preventing "a fusion of governmental and religious functions".... The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions.

*Id.* at 126–27, 103 S.Ct. at 511–12.

The facts in this case are in no way analogous to those in *Larkin*. The state has not delegated a discretionary authority to a religious institution. The state has provided public funds to a nonsectarian school located on property owned by a charitable and religious organization. The

District has maintained control over all essential aspects of the curriculum and policy. Plaintiffs argue that the fact that the Director of the School helps to determine the work assignments of District employees and selects textbooks amounts to an unlawful delegation of authority. The Director carries out her duties in accordance with the specific instruction of the District with respect to curriculum, teaching, and school policies. Plaintiffs' argument on delegation of state authority is far off the mark.

Additionally, plaintiffs argue that the Court should employ an alternative test in analyzing the facts of this case, namely, the "endorsement test." The endorsement test generally has been applied by the Supreme Court to cases involving government use or endorsement of a religious symbol. As the Court stated in *County of Allegheny v. American Civil Liberties Union*, — U.S. ——, 109 S.Ct. 3086, 3102, 106 L.Ed.2d 472 (1989), the endorsement test "provides a sound analytical framework for evaluating government use of religious symbols." More specifically, the endorsement test articulated in Justice O'Connor's concurrence in *Allegheny*, "articulates a method for determining whether the government's use of an object with religious meaning has the effect of endorsing religion." *Id.* Again, in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Justice O'Connor applied the endorsement mode of analysis to resolve a challenge to a city's creche display. Finally, the endorsement test was discussed in a concurring opinion in *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), a case involving the constitutionality of a statute providing for a moment of silence for voluntary prayer in a public school. The *Lemon* test has been the primary test used by the Supreme Court in analyzing legislation and aid programs to sectarian schools. The endorsement test has not replaced the *Lemon* test in this type of case, but could be viewed as an aspect of the primary effect prong. As stated earlier, however, because the School in this case is nonsectarian, district involvement and use of public funds at the School does not have the effect of "endorsing" religion.

## C.

■ Plaintiffs also allege that the use of public funds at the School violates Article IX, Section 8 of the Constitution of the State of California. Article IX, Section 8, reads as follows:

No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State.

As discussed above, the School is not sectarian or denominational, and the provisions in Section 8 with respect to sectarian or denominational doctrine are not applicable to the School. With respect to the exclusive control provision, the Court has noted that the School is under the direct control of the District, follows District curriculum and policy, and mirrors all educational aspects of the public schools.

■ One California court construing the "exclusive control" language in Section 8, looked back at the legislative history of the provision and found that it was included as an expression of concern about funding "any opposition system of schools against the common schools of the state...." *Board of Trustees of the Leland Stanford Junior University v. Kenneth Cory*, 79 Cal.App.3d 661, 662, 145 Cal.Rptr. 136 (1978), *citing* 3 Debates and Proceedings of the Constitutional Convention of the State of California (1881) at 1261. The School could by no stretch of the imagination be viewed as an opposition school, or even an alternative school. Although not funded entirely by public funds, the School is modeled after and controlled by the public school system. With respect to education and instruction, the School is under the exclusive control of the public school system.

■ Plaintiffs have argued that the Mount, rather than the School, is the beneficiary of public funds in this case, and the Mount is clearly not under the exclusive control of the state. Even this broader view of what constitutes the benefiting institution will not lead to the conclusion that provision of public funds violates Article IX, Section 8, of the Constitution of the State of California.

In a case dating back to 1887, *Aid Society v. Reis,* 71 Cal. 627, 632, 12 P. 796 (1887), cited in *Board of Trustees v. Cory,* 79 Cal.App.3d at 663, 145 Cal.Rptr. 136, it was held that the provision of funds by the City and County of San Francisco to help support privately-run societies for maintenance and care of delinquent children did not violate the constitutional provision in question because the societies were not organized for the sole purpose of disseminating knowledge and imparting scholastic instruction.

If the Mount were deemed to be the benefiting institution in this case, the Court would be required to define its purposes more broadly than for "disseminating knowledge and imparting scholastic instruction." According to *Reis,* provision of public funds under such circumstances would not violate Section 8 of the California Constitution.

## II.

### A.

#### 1.

Chapter 2, entitled "Federal, State, and Local Partnership for Educational Improvement," 20 U.S.C. § 2911 *et seq.,* provides financial assistance to state educational agencies ("SEAs") and local educational agencies ("LEAs") to implement various educational programs.

In keeping with its goal to improve educational opportunities for all school children, Chapter 2 requires SEAs and LEAs to provide for the equitable participation of children enrolled in private, nonprofit elementary and secondary schools in the LEA. 20 U.S.C. § 2972(a). Funds expended under Chapter 2 for the benefit of private school children must, "consistent with the number of children to be served," be equal to funds expended for the benefit of public school students, "taking into account the needs of the individual children and other factors which relate to such expenditures...." 20 U.S.C. § 2972(b). To guard against the unlawful advancement of religion, however, the "services, materials, and equipment" provided under Chapter 2 for the benefit of such private school students must be "secular, neutral, and nonideological." 20 U.S.C. § 2972(a)(1). Chapter 2 funds must supplement, and in no case supplant, the level of funds that, in the absence of Chapter 2 funds, would be made available for school programs from nonfederal sources. 20 U.S.C. § 2971(b).

Chapter 2 also requires that the control of all Chapter 2 funds "and title to materials, equipment, and property ... shall be in a public agency ... and a public agency shall administer such funds and property." 20 U.S.C. § 2972(c)(1). In addition, any services provided for the benefit of private school students must be provided by a public agency or by a contractor "who ... is independent of such private school and of any religious organizations...." 20 U.S.C. § 2972(c)(2). Chapter 2 empowers the Secretary of the United States Department of Education to withhold or recover funds from an SEA if there has been a failure to comply substantially with the provisions of Chapter 2.

#### 2.

Defendant State Board of Education ("State Board") is the designated SEA in California. To carry out its obligation under Chapter 2 to assure compliance with the statute, the SEA has developed a set of forms that require all LEAs to provide sufficient information to it to allow the State Board to meet its obligations to monitor and evaluate Chapter 2 programs and activities. The SEA distributes Chapter 2 guidelines to all LEAs in the state and conducts periodic on-site monitoring visits to each LEA. Unless it deems more frequent visits necessary, the SEA monitors each LEA once every three years.

### 3.

The District makes the final decision as to what Chapter 2 benefits will be provided to private schools with students participating in Chapter 2 by having the schools submit "needs assessment" forms describing the needs of the students and the specific information on how those needs can be met through the Chapter 2 program.

The Chapter 2 Administrator of the District personally reviews the information submitted on behalf of the private school students to ensure that the benefits suggested by private school officials are appropriate and meet all statutory and regulatory requirements. The District also receives signed assurances from the school officials that all materials and equipment will be used for secular purposes, will supplement and not supplant the level of services that would be provided without Chapter 2 benefits, and will otherwise be used in compliance with Chapter 2. Additionally, District staff make one monitoring visit each year to each private school to make sure that Chapter 2 benefits are being used in accordance with all regulatory and statutory requirements.

The vast majority of students who benefit from the Chapter 2 program in the District are public school students. In the 1988–89 school year, approximately seventy-four percent of the students participating in the Chapter 2 program were public school students and twenty-six percent were private school students. Although no specific figure was provided by the parties, a substantial number of the nonpublic school students receiving Chapter 2 funds attend secular private schools. Thirty-two of the eighty-seven nonpublic schools in which students receive Chapter 2 funds are secular.

For the 1989–90 school year, the only Chapter 2 benefits provided to children in religious schools in the District are prescreened library books, prescreened instructional and reference materials, and "locked" computer hardware and software that cannot be diverted to religious use. The books and book substitutes for use by nonpublic students are ordered directly by the District. The Program Administrator of Textbooks, Media and Library Services reviews all books and book substitutes provided for the benefit of nonpublic school students to insure that they are secular in nature.

### B.

There are three major questions presented in these cross-motions for summary judgment:

1. Are the challenged provisions of Chapter 2, 20 U.S.C. § 2911, *et seq.*, facially unconstitutional?

2. Do plaintiffs have standing to challenge the provisions of Chapter 2 as implemented by the District?

3. If plaintiffs have standing, are the challenged provisions of Chapter 2 unconstitutional as implemented by the District?

### 1.

█ Plaintiffs argue that the Chapter 2 legislation is unconstitutional on its face. They have, however, suggested a narrow interpretation of the legislation that they argue would allow the legislation to pass the "non-establishment test of the First Amendment." Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment and Memorandum in Reply to Defendants' Opposition (Chapter 2 Claims) (hereinafter cited as "Plaintiffs' Opposition") at 7–8.

Defendants argue that plaintiffs' concession that Chapter 2 funds can be constitutionally spent to purchase textbooks for students enrolled in private religious schools and/or be used to provide Chapter 2 benefits for private school students off the premises of these schools amounts to a concession that the statute cannot be deemed unconstitutional on its face.

Defendants rely on the test established by the Supreme Court for facial constitutional challenges to congressional statutes in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1986). In *Salerno*, the Supreme Court considered a facial challenge to the constitutionality of the Bail Reform Act of 1984. The Court noted that "[a] facial challenge to a legisla-

tive Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. at 2100.

Because plaintiffs have suggested a specific alternative method for implementing Chapter 2 funding programs that they agree would not be unconstitutional, defendants argue that plaintiffs have provided proof that, under the *Salerno* test, the statute at issue is not facially unconstitutional.

Plaintiffs argue that although the *Salerno* test is applicable in all other areas of law, it is not applicable in the Establishment Clause area. As support for this proposition, plaintiffs cite a footnote in Justice Blackmun's dissent in *Kendrick,* 108 S.Ct. at 2583–84 n. 1. There, although Justice Blackmun disagreed with the majority on the primary issue before the Court, he went on to discuss an issue that was not directly mentioned by the majority opinion, but that he believed must have been part of their reasoning:

> A related point on which I do agree with the majority is worth acknowledging explicitly. In its appeal to this Court, the Government vigorously criticized the District Court's analysis of the [statute] on its face, asserting that it "cannot be squared with this Court's explanation in *United States v. Salerno,* that mounting a facial challenge to a legislative Act, 'the challenger must establish that no set of circumstances exists under which the act would be valid.' " The Court, however, rejects the application of such rigid analysis in Establishment Clause cases, explaining: "As in previous cases involving facial challenges on Establishment Clause grounds, ... we access the constitutionality of an enactment by reference to the three factors first articulated in *Lemon v. Kurtzman.*" Indeed the Government's proposed test is wholly incongruous with analysis of an Establishment Clause challenge under *Lemon,* which requires our examination of the purpose of the legislative enactment, as well as its primary effect or potential for

fostering excessive entanglement. Although I may differ with the majority in the application of the *Lemon* analysis to the [statute], I join it in rejecting the Government's approach which would render review under the Establishment Clause a nullity. Even in a statute like [this one], with its solicitude for, and specific averment to, the participation of religious organizations, one could hypothesize some "set of circumstances ... under which the Act would be valid," as, for example, might be the case if no religious organization ever actually applied for or participated under [a grant under this statute.] The Establishment Clause cannot be eviscerated by such artifice."

*Id.* at 2583–84 n. 1 (citations omitted).

Defendants point out that the majority opinion did not speak directly to this issue. For that reason, they argue that this Court should disregard the discussion in the dictum of Justice Blackmun's dissent in *Kendrick,* and follow the traditional rule for facial challenges set out in *Salerno.*

This Court will not follow defendants' suggestion on this point. Although the majority opinion in *Kendrick* does not speak explicitly on the use of the *Salerno* test in Establishment Clause cases, a review of the majority's approach to the facial challenge of the statute at issue there indicates that, rather than merely applying the *Salerno* test of whether the statute could ever be applied in a constitutional fashion, it applied the three-part *Lemon* test.

This Court will use the same approach. Following the *Lemon* test, however, leads this Court to the same result that defendants originally suggested—a finding that the statute at issue is not facially unconstitutional.

2.

None of the parties actually performed the analysis under the *Lemon* test in the context of the facial challenge. Defendants did not because they argued that the Court should stop at the *Salerno* test and ask only whether there was any possible

way to implement the statute constitutionally. Although plaintiffs went to great lengths to argue that the Court should not stop at the *Salerno* question, but should go on and determine the facial constitutionality of the statute in accordance with the *Lemon* test, they failed to provide any such analysis themselves. Instead, all of plaintiffs' *Lemon* analysis focused on how the Chapter 2 program is implemented in the District. The Court will come to these issues later when it reaches the issue of whether the statute is constitutional as applied, but it needs first to do a complete analysis of whether the statute is constitutional on its face.

Under the *Lemon* test, as discussed in Section I.B. above, a court may invalidate a statute if (1) the statute is motivated by a wholly impermissible purpose, (2) its primary effect is the advancement of religion, and (3) it results in excessive entanglement between church and state. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111.

(a).

The purpose of Chapter 2 was stated clearly in the statute itself:

1. to provide the initial funding to enable State and local educational agencies to implement promising educational programs that can be supported by State and local sources of funding after such programs are demonstrated to be effective;

2. to provide a continuing source of innovation, educational improvement, and support for library and instructional materials;

3. to meet the special educational needs of at risk and high cost students, as described in section 2941(b) of this title;

4. to enhance the quality of teaching and learning through initiating and expanding effective schools programs; and

5. to allow State and local educational agencies to meet their educational needs and priorities for targeted assistance described in section 2941 of this title.

20 U.S.C. § 2911(b).

There is no question that the purpose of the statute is secular and that it was not inspired by any impermissible objective.

(b).

In addressing the second prong of the *Lemon* test as to whether the primary effect of the challenged legislation is either to advance or inhibit religion, it is useful to review what the legislation sets out to do, namely, to provide instructional materials and more effective school programs and to meet the needs of at-risk and high-cost students.

As was the case in *Kendrick*, there is no requirement in Chapter 2 "that the grantees be affiliated with any religious denomination, although [it] clearly does not rule out grants to religious organizations." 108 S.Ct. at 2572. The services to be provided are not religious in character. Nothing on the face of the statute suggests that Chapter 2 is anything but neutral with respect to the grantees' status as either sectarian or purely secular institutions. In this regard, Chapter 2 "is similar to other statutes that [the Supreme] Court has upheld against Establishment Clause challenges in the past." *Id.* 108 S.Ct. at 2573, *citing Roemer*, 426 U.S. 736, 96 S.Ct. at 2339.

The primary effect of Chapter 2 is neither to endorse or advance religion. There is no question that on its face the primary effect of the legislation is not unconstitutional.

(c).

Under the third prong of the *Lemon* test, the Court needs to address whether the statute leads to "excessive government entanglement with religion." The focus under this prong of the *Lemon* test is on the type and degree of monitoring that is necessary to ensure that the secular purposes of Chapter 2 are fulfilled.

Chapter 2 requires that any state that desires to receive grants submit to the Secretary of the United States Department of Education ("Secretary") an application that sets forth the allocation of such funds required to implement the program and "provides for an annual submission of data on the use of funds, the types of services furnished, and the students served...." 20 U.S.C. § 2932(a)(6)(A). Section 2973(a)

requires local agencies that receive funds to report annually to the SEA. The SEA evaluates the effectiveness of the state and local programs. Under § 2973(c), the Secretary, in consultation with state and local educational agencies, "shall develop a model system which state educational agencies may use for data collection and reporting...."

As was the case in *Kendrick*, there is "no reason to fear that the less intensive monitoring involved here will cause the government to intrude unduly in the day-to-day operation of the religiously affiliated ... grantees." 108 S.Ct. at 2578. On its face, it is not apparent that Chapter 2 will result in excessive entanglement of church and state.

Application of the *Lemon* test leads to the conclusion that Chapter 2 is not facially unconstitutional.

### 3.

■ Before proceeding to determine whether Chapter 2 as implemented by the District is unconstitutional, it is appropriate to determine whether plaintiffs have standing to raise such a constitutional challenge.

*Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), was the case that gave rise to the Establishment Clause exception to the general rule that persons do not have standing as taxpayers to challenge government action. *Flast* involved a challenge to Titles I and II of the ESEA, legislation that was amended to become the presently challenged Chapter 2.

Under *Flast*,

"Whether such individuals have standing to maintain that form of action turns on whether they can demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements.

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8 of the Constitution.... Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction."

*Id.* at 102–103, 88 S.Ct. at 1953–1954.

That plaintiffs in this case have satisfied the first nexus is clear. They are taxpayers challenging an aspect of a statute enacted under the Taxing and Spending Clause.

Defendants suggested that *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), might defeat plaintiffs' first nexus. *Valley Forge* involved a challenge to an executive action taken pursuant to legislation enacted under the Property Clause. There, the plaintiff failed the first nexus test. Here, the legislation was enacted under the Taxing and Spending Clause and the first nexus is established.

The real dispute between the parties with respect to standing is whether plaintiffs have been able to establish the second nexus outlined in *Flast*. Defendants argue that *Flast* only authorized taxpayer challenges to congressional action, but that here plaintiffs' attack is directed to the executive administration of the congressional action and not to the congressional action itself. Defendants are incorrect.

In *Flast*, plaintiffs made two arguments: first, that either the executive implementation of the legislation went beyond what Congress had authorized, in a manner that made the implementation unconstitutional, or second, that if the executive implementa-

tion was actually authorized by the statute, then the statute itself was unconstitutional.

The Supreme Court found that the plaintiffs had standing because one of the theories upon which they attacked the legislation was that the congressional action itself was unconstitutional.

In this case, defendants point out that plaintiffs' focus has been on the manner in which Chapter 2 is implemented. They argue that this focus indicates that plaintiffs have not attacked the congressional action but have only attacked the executive implementation of the statute. As was the case in *Flast*, however, plaintiffs here argue that to the extent the executive implementation of the statute was authorized by Congress, it is the congressional action itself that is challenged.

Next, defendants note that plaintiffs have named the District as a defendant, and argue that this fact proves that what is being challenged is the executive implementation of the legislation rather than the legislation itself. As plaintiffs point out, in both *Flast* and *Kendrick*, the named defendants were executive branch actors, yet standing was established.

Defendants try to distinguish both *Flast* and *Kendrick*, by arguing that in those cases the executive action was mandated by Congress and the executive actor did not exercise any discretion in implementing the statute in an unconstitutional manner. Defendants are correct that this case is different from *Kendrick* because in *Kendrick* Congress had mandated the grant of Adolescent Family Life Act funds under the statute to religious organizations. Defendants, however, cannot distinguish this case from *Flast*. They argue that the plaintiffs in *Flast* challenged "the mandatory statutory directive that private school children be included in the program." Plaintiffs' Reply Memorandum in Support of Cross Motion for Partial Summary Judgment, filed Jan. 26, 1990, at 4. This is incorrect. Plaintiffs in *Flast* did not challenge the mandatory directive of funds to private schools, but the actual direction of some of those funds to sectarian schools. Although it was an executive branch deci-

sion to actually direct the funds to the sectarian schools, because the executive decision to do so was authorized by the legislation itself, the Court found that the plaintiffs had standing. It is important to note that the congressional authorization in *Flast* merely gave the executive branch the permission to direct the funds to sectarian schools, it was not a mandatory congressional directive.

The posture of this case is exactly the same as that in *Flast*. Plaintiffs are challenging the executive branch implementation of the legislation. In particular, they are challenging the direction of specific types of materials for use by students who attend sectarian schools. The executive branch decision to grant some of these materials to these students is not mandated by Congress but is permitted or authorized by the legislation. To the extent that the executive branch action of granting some of these materials to the students who attend secular schools is authorized by the legislation, plaintiffs argue that the legislation is unconstitutional.

Defendants also rely heavily on *In re United States Catholic Conference v. Baker*, 885 F.2d 1020 (2d Cir.1989), a case decided after *Kendrick* in which the Second Circuit found that the plaintiffs did not have standing because the challenged action was solely an executive branch action and not a congressional action.

In *In re United States Catholic Conference*, the plaintiff challenged the executive branch decision to grant tax exempt status to the Roman Catholic Church in accordance with § 501(c)(3) of the Internal Revenue Code. The plaintiffs did not challenge the congressional decision to allow the grant of tax exempt status to any religious organizations. They only challenged the decision by the executive branch to grant that status to the Roman Catholic Church because, according to plaintiffs, the Roman Catholic Church did not meet the criteria for tax exemption set out in the statute.

The distinction emphasized by defendants between congressional and executive branch action is important. Yet defendants are incorrect that in this case plain-

tiffs' challenge is directed solely to executive branch action. Plaintiffs have established both the first and the second nexuses outlined in *Flast*. They have standing to raise the issues before this Court.

Finally, defendants suggested that plaintiffs have not suffered any harm that can be redressed and that, as a result, they lack standing. As plaintiffs correctly point out, what was true in *Flast* is true here:

. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. Such an injury is appropriate for judicial redress....

392 U.S. at 106, 88 S.Ct. at 1955.

Preventing the expenditure of tax dollars to advance or endorse religion or further government entanglement with the church would redress plaintiffs' injury if it were shown that expenditure of their tax dollars did in fact cause those injuries.

4.

■■■ The Court now turns to the question of whether the challenged provisions of Chapter 2 are unconstitutional as implemented by the District. Here again, the Court must apply the three-part test established in *Lemon*.

(a).

There is no serious dispute over whether the primary purpose of Chapter 2 is permissible. In fact, plaintiffs raise the issue of the primary purpose only superficially by stating that "[t]here is a disputed issue as to Chapter 2's Secular Purpose." Plaintiffs' Opposition at 24. Plaintiffs provide no evidence to support the allegation that "Chapter 2 is designed and written with the intent and purpose of aiding private schools, including those pervasively sectarian." Plaintiff's Opposition at 24.

As was discussed earlier, there is absolutely nothing in the written statute to indicate that the purpose of the legislation was to aid sectarian schools. Congress' intent in enacting the statute was to provide "the initial funding to enable State and local educational agencies to implement promising educational programs ...," and to "provide a continuing source of innovation, educational improvement, and support for library and instructional materials." 20 U.S.C. § 2911(b)(1)(2).

Plaintiffs have provided no evidence that these secular goals were a pretext for assisting the pervasively sectarian schools in particular.

The Supreme Court has never struck down a neutral educational aid statute on the ground that its purpose was religious. *See, e.g., Wolman v. Walter*, 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977); *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111; *Tilton v. Richardson*, 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971).

In each of these cases, the Supreme Court "accorded appropriate deference" to the legislature's statement of secular intent. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. This Court will do the same and finds that Chapter 2 meets the first prong of the *Lemon* test.

(b).

The main argument provided by defendants under the second prong of the *Lemon* test is that "[t]he Supreme Court has repeatedly held that a program that assists a broad class of beneficiaries *without regard to their religion* does not unlawfully advance religion merely because some of its beneficiaries happen to attend religious schools." Defendants' Reply Memorandum in Support of Cross Motion for Partial Summary Judgment, filed Jan. 26, 1990, at 10. Defendants are correct.

For example, in *Mueller v. Allen*, 463 U.S. 388, 398–99, 103 S.Ct. 3062, 3068–69, 77 L.Ed.2d 721 (1983), the Supreme Court stated that "a program ... that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause." Similarly, in *Everson v. Board of Education of the Township of Ewing*, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), the Court stated that "we must be careful, in protecting the citizens of New Jersey against state-established churches,

to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all citizens without regard to their religious belief." Again in *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the program at issue was upheld because it was " 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institutions benefited.' " *Id.* at 487–88, 106 S.Ct. at 751–52, *citing Nyquist,* 413 U.S. at 782–83 n. 38, 93 S.Ct. at 2970 n. 38.

As noted by defendants, all of the cases relied upon by plaintiffs to argue that the primary effect of Chapter 2 would be to endorse religion involved state programs directed *exclusively* at students in private schools, the vast majority of which were religious. *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Wolman, supra; Public Funds for Public Schools of New Jersey v. Marburger,* 358 F.Supp. 29 (D.N.J.1973), *aff'd,* 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974); *Grand Rapids, supra.*

Plaintiffs point out that the state statute in *Meek* contained a preamble that stated that the legislature wanted to provide benefits to children in private schools equal to benefits provided to children in public schools. The program enacted, however, only applied to and benefited private school children. For that reason it was found not to be neutral and was struck down.

In contrast, Chapter 2 is actually directed to all students regardless of what school they attend, public or private, sectarian or nonsectarian. The vast majority of students receiving Chapter 2 funds in the District attend public schools. Under *Mueller, Witters,* and *Everson,* Chapter 2 is constitutional and does not have the primary effect of endorsing or inhibiting religion. As was stated by Justice Powell in his concurrence in *Witters:*

> [S]tate programs that are wholly neutral in offering educational assistance to a class defined without reference to religion does not violate the second part of the *Lemon v. Kurtzman* test, because

any aid to religion results from the private choices of individual beneficiaries. 474 U.S. at 490–91, 106 S.Ct. at 753–54 (footnote omitted).

Chapter 2 is wholly neutral and makes no reference to religion. Under the second prong of the *Lemon* test, the primary effect of Chapter 2 is not unconstitutional.

Besides the issue of to whom the statute directs the aid, interspersed within plaintiffs' second prong analysis are a number of subissues. First, plaintiffs argue that the nature of the aid itself and whether it is "divertible" is significant.

Plaintiffs have argued that provision of instructional material other than screened textbooks (such as videotape machines), might result in state support of religious purposes if they were "diverted" to religious uses. The only materials currently provided to sectarian school students in the District under Chapter 2 are prescreened textbooks, prescreened instructional materials, and "locked" computer hardware and software that cannot be diverted to religious use.

Next, plaintiffs suggest that the statutory provisions of Chapter 2 do not ensure that it benefits students rather than schools. The two cases cited by plaintiffs in connection with this issue both involved statutes in which the state aid was directed solely to students at nonpublic schools. As was discussed previously, the Supreme Court has been particularly concerned about Establishment Clause implications when the statutes involved provide aid to a particular group of children. In *Wolman,* the Court found that the equipment would unavoidably aid the religious role of the parochial school because none of the aid was directed to public schools. In *Grand Rapids,* a case in which forty of the forty-one schools involved were found to be pervasively sectarian, the Court was concerned that the sectarian schools would be the real beneficiaries, and expressed its view that the idea that the children were the ones who really benefited was a fiction. Neither of these cases bear any similarity to the facts here, where seventy-four percent of the Chapter 2 funds at issue go to

public school students and a substantial portion of the funding that goes to nonpublic school students goes to students at secular private schools.

Next, plaintiffs cite *Tilton* as an example of a Supreme Court decision invalidating a neutral program designed to benefit both public and private schools. The statute in *Tilton*, provided construction grants directly to colleges and universities, including religiously-affiliated schools. That statute was upheld (not invalidated as suggested by plaintiffs), except for one small portion of the law that lifted restrictions on religious use after twenty years. Under Chapter 2, the materials provided may never be used for religious purposes. *Tilton* supports defendants' rather than plaintiffs' argument.

Plaintiffs also repeatedly cite *Kendrick* and suggest that it "unequivocally exterminates defendants' assertions that Chapter 2 is constitutional." Plaintiffs' Opposition at 32. *Kendrick* involved a challenge to congressionally-authorized grants of money to organizations, some of which were religiously affiliated, to help provide health care and counseling related to premarital adolescent sexual relations and pregnancy. *Kendrick* does not support plaintiffs' position.

First, the potential for First Amendment conflicts obviously is much greater where Congress authorizes direct funds for counseling on the subject of adolescent pregnancy from the perspective of a particular religion than, as here, where all aid is in the form of prescreened secular instructional materials.

Second, the Supreme Court did not hold in *Kendrick* that all aid to pervasively sectarian institutions was unconstitutional. In fact, the Court cited with approval *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), where the Court had approved the provision of textbooks to children in such institutions. The *Kendrick* Court held that the statute was not unconstitutional on its face and that the district court had erred in invalidating the statute and enjoining funding of religious

organizations, given the absence of findings as to the nature of the institutions receiving grants, and whether their secular purposes and religious missions were "inextricably intertwined." *Kendrick*, 108 S.Ct. at 2580, n. 16.

Finally, in their discussion of the primary effect of Chapter 2, plaintiffs cite *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), in an attempt to undercut defendants' assertion that the Supreme Court has never evaluated a neutral aid program and found it unconstitutional. In *Aguilar*, the aid program involved publicly-funded teachers instructing students in religious schools. The Court invalidated the program on the basis of excessive entanglement, the third prong of the *Lemon* test, and not on the basis of the primary effect of the aid. As will be discussed in the next section, Chapter 2 does not involve teachers instructing students in private school classrooms, and does not result in excessive entanglement of church and state.

The fact that Chapter 2 is directed to all children equally, as opposed to nonpublic school children in particular, is the important factor that makes this case different from those where the Supreme Court has found that the primary effect of government aid was to endorse religion. Seventy-four percent of the students who receive Chapter 2 funds in the District attend public schools. The primary effect of Chapter 2 is neither to endorse nor inhibit religion, and it passes the second prong of the *Lemon* test.

### (c).

Plaintiffs argue that the implementation of Chapter 2 in the District results in "excessive entanglement" between church and state and does not pass the third prong of the *Lemon* test. To meet their burden of proof on this issue, plaintiffs must demonstrate that Chapter 2 requires "comprehensive, discriminating, and continuing state surveillance" over religious authorities. *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114. Plaintiffs have failed to meet their burden.

The only materials currently purchased for use by children in religious schools in

the District are books and book substitutes, such as filmstrips and videocassettes, and the only equipment purchases are nondivertible computer hardware. The books and instructional materials are prescreened by the District staff to make sure that they are secular in nature and the computer equipment is "locked" so that it can only use certain prescreened secular software.

The items provided are self-monitoring and do not require "comprehensive, discriminating, and continuing state surveillance," to make sure that they are not used for unlawful purposes.

The Supreme Court has never invalidated an educational aid program that provides secular materials and equipment to children in religious schools on excessive entanglement grounds. As discussed above, in *Aguilar*, the Court was concerned exclusively with instruction by publicly-funded teachers in religious school buildings. Plaintiffs' suggestion that *Aguilar* also invalidated the use of equipment on religious school premises is incorrect.

The one other case cited by plaintiffs to counter defendants' argument that the Supreme Court has never found excessive entanglement in educational aid unless the challenged program involved teachers, as opposed to neutral textbooks and equipment, is *Marburger*.

In *Marburger* the district court invalidated the state statute because the program was directed exclusively at students in private schools. The Supreme Court's summary affirmance of that decision does not reveal the grounds upon which the Court upheld the district court's decision but, given the views expressed by the Court in other cases involving funds directed solely at nonpublic schools, it is likely that the Court was affirming the decision on primary effect grounds. Moreover, the materials provided under the *Marburger* statute were not limited to items that by their nature were incapable of diversion to religious use. Even if *Marburger* was upheld on excessive entanglement grounds, the two features of the program that led to that decision—that the aid was directed solely to nonpublic schools and that the

material was capable of diversion to religious use—are not present in this case.

Plaintiffs also argue that because the parochial school teacher gives meaning to the secular materials being provided, it will take a strong monitoring system to ensure that the teachers do not inculcate religious values while using the materials provided. This argument ignores the Supreme Court cases that have repeatedly upheld the loan of textbooks to students in religious schools without requiring a government employee to sit in the classroom to make sure that the teachers are not using the secular materials for religious purposes. *See e.g., Wolman*, 433 U.S. 236–38, 97 S.Ct. at 2599–2600; *Allen, supra.*

The secular filmstrips, videocassette and computer software that are purchased for loan to students under Chapter 2 require no more monitoring to insure that they are only used for secular purposes than the textbooks discussed in the cases cited above.

Aside from the current implementation of Chapter 2 in the District, plaintiffs argue that Chapter 2 materials dispersed in past years included equipment such as videocassette recorders, film projectors, and computers, that were not "locked" or made nondivertible. Plaintiffs argue that these materials must now be returned to the District. They have provided no evidence, however, that any of these materials were ever put to nonsecular purposes.

The State Board has developed forms that require all LEAs to provide sufficient information to allow it to meet its obligations to monitor and evaluate Chapter 2 programs. The District requires nonpublic school officials to provide signed assurances that all materials and equipment are being used only for secular purposes. District staff make one monitoring visit each year to each private religious school to make sure that Chapter 2 benefits are being used in accordance with all regulatory and statutory requirements.

In light of the restrictions on religious use contained in the Chapter 2 statute and regulations, and the fact that plaintiffs have provided no evidence of any misuse of

these materials for religious purposes, there is no reason to provide a retroactive remedy for the implementation of Chapter 2 in the District in past years. The District made the prospective determination to limit provision of Chapter 2 materials to completely nondivertible items.

Plaintiffs have not shown that the self-monitoring instructional materials provided under Chapter 2 to nonpublic schools require "comprehensive, discriminating, and continuing state surveillance." There is no risk that the provision of Chapter 2 aid to nonpublic schools in the District will result in excessive entanglement of church and state.

Under the three-part *Lemon* test, the provision of Chapter 2 aid in the District is constitutional as applied.

### 5.

■ Finally, plaintiffs argue that Chapter 2 violates the Equal Protection Clause of the Fourteenth Amendment. The Fourteenth Amendment applies only to state, not federal, laws. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1953). The Fifth Amendment Due Process Clause embodies equal protection guarantees similar to those contained in the Fourteenth Amendment. Plaintiffs, however, have no standing as federal taxpayers to assert Fifth Amendment claims in connection with Chapter 2.

As discussed earlier in *Flast,* the Supreme Court discussed the two nexuses that must be established by plaintiffs before standing will be found. The second nexus could be established if the taxpayer demonstrated a connection:

"between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8."

392 U.S. at 102–103, 88 S.Ct. at 1953–54.

Plaintiffs have not and cannot establish this nexus. An allegation of a due process violation does not relate to a specific limitation of the congressional taxing and spending power. "The exception to [the general rule that taxpayers do not have standing] is only available when the taxpayer can establish that the challenged expenditure exceeds specific constitutional limits other than general grounds of due process imposed upon the taxing and spending power." *Clark v. United States,* 609 F.Supp. 1249, 1250 (D.Md.1984).

Plaintiffs do not have standing as taxpayers to assert due process violations in connection with Chapter 2.

### III.

For the foregoing reasons,

IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment with respect to Simpatico School is granted, and plaintiffs' motion is denied.

2. Defendants' motion for summary judgment with respect to Chapter 2 is granted, and plaintiffs' motion is denied.